**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CRIMINAL ACTION NO. H-06-226 |
| § | CIVIL ACTION NO. H-09-1586 |
| § | |
| GREGORY DARNELL PARKS, § | |
| § | |
| Defendant. § | |

**MEMORANDUM AND OPINION**

In 2007, Gregory Parks pleaded guilty to one count of mail fraud under 18 U.S.C. § 1341 and one count of aggravated identity theft under 18 U.S.C. § 1028A. The charges against Parks were based on fifteen fraudulent applications he submitted to the Federal Emergency Management Agency for disaster assistance after Hurricane Katrina and Hurricane Rita. Parks used a different social security number on each of these applications. The record relating to the guilty plea did not include any evidence that Parks knew that any of the social security numbers he used belonged to another person. When he pleaded guilty, only one circuit had held that such proof was an element of the offense. *See United States v. Montejo*, 442 F.3d 213 (4th Cir. 2006).

In 2009, the Supreme Court held that § 1028A requires the government to prove that a defendant knew that the means of identification used belonged to an another person. *See Flores-Figueroa v. United States*, --- U.S. ----. 129 S. Ct. 1886, 1888 (2009). Based on that decision, Parks has moved to vacate his conviction for Count 11, the aggravated identity theft count, under 28 U.S.C. § 2255. Parks argues that there was no allegation or evidence he knew he was using social

security numbers belonging to other people and that his guilty plea was neither voluntary nor knowing. (Docket Entry No. 51). Because Parks did not appeal, the issue is whether he may overcome procedural default by showing actual innocence. *See Bousley v. United States*, 523 U.S. 614, 616, 118 S. Ct. 1604 (1998). The government argues that there is sufficient circumstantial evidence to support the guilty plea and conviction even after *Flores-Figueroa*. The government bases its argument on the fact that *all* the social security numbers Parks used in his fraudulent FEMA applications had in fact been assigned to other individuals. The government argues that this is so statistically unlikely as to preclude Parks from meeting his burden of showing that no reasonable juror would have convicted him of aggravated identity theft. (Docket Entry No. 58). Parks has filed a reply, (Docket Entry No. 59), to which the government has responded, (Docket Entry No. 60).

Based on the motions, responses, and replies; the record and the parties' submissions; and the applicable law, this court grants Parks's motion and denies the government's motion. The conviction and sentence for aggravated identity theft are vacated. The parties must confer and file a proposed form of order and final judgment by May 28, 2010.

The reasons are explained below.

**I.     Background**

On September 22, 2006, Gregory Parks pleaded guilty to one count of mail fraud and one count of aggravated identity theft. (Docket Entry No. 26).[1] On February 8, 2007, this court sentenced Parks to 39 months in prison, consisting of 15 months on the mail fraud count and a mandatory consecutive 24 months on the aggravated identity theft count, followed by three years

---

[1] Although the plea agreement barred Parks from appealing or collaterally attacking his conviction or sentence, the government has agreed to waive that restriction for the purpose of this motion. (Docket Entry No. 58 at 1-2).

2

of supervised release. The sentence also included the $200 mandatory assessment and $34,948 in restitution. (Docket Entry No. 38). Judgment was entered on February 21, 2007. (Docket Entry No. 42).

The charges against Parks were based on fifteen applications for disaster assistance he filed with FEMA between September 12 and October 27, 2005. Parks stipulated to "using fifteen distinct and assigned social security numbers and fifteen different 'damaged addresses' in New Orleans and Lake Charles, Louisiana, and Orange, Port Arthur and Port Neches, Texas." (Docket Entry No. 26 at 11). Before submitting these fifteen fraudulent applications, Parks had submitted one using his true social security number,[2] xxx-xx-4088.[3] In each of the fifteen applications, Parks claimed that the address was his primary address, that he had lost personal property as a result of Hurricanes Katrina and Rita, and that he "had an essential need for food, clothing and shelter." (*Id.*). FEMA sent him $35,548 in disaster assistance funds. (*Id.* at 12).

The charges to which Parks pleaded guilty specifically related to one of the fifteen applications Parks submitted. He submitted this application in his own name, used the social security number xxx-xx-4156, and listed his address as 4109 Heather Brook Court, Port Arthur, TX 77642. Parks used his own name on all the applications at issue. The other social security numbers Parks used were the following: xxx-xx-4678, xxx-xx-1204, xxx-xx-8072, xxx-xx-4033, xxx-xx-1623, xxx-xx-9947. xxx-xx-1115, xxx-xx-6842, xxx-xx-2137, xxx-xx-0915, xxx-xx-4767, xxx-xx-4428, xxx-xx-9111, xxx-xx-3800. (Docket Entry No. 58 at 9). There is no dispute that all these

---

[2] Apparently this application, despite containing Parks's actual social security number, was also fraudulent.

[3] As explained below, the government has put the full social security numbers Parks used at issue. Redacted numbers are insufficient to evaluate the issues in this case. Accordingly, the complete numbers are used. All but the last four digits of each are redacted in this opinion. An unredacted copy of the same opinion is filed under seal.

numbers were valid and assigned to other individuals. There is no evidence that Parks had a list of these individuals or their social security numbers. (Docket Entry No. 22 at 24-25).

The Social Security Administration ("SSA") is charged with assigning social security numbers. Over 420 million different numbers have been issued and many more are still available. The nine digits could be rearranged in one billion different combinations but the SSA has made certain number combinations unavailable, which reduces the total to approximately 980 million. (Docket Entry No. 58, Attachment B). A nine-digit social security number has three parts. The first three digits are called the area number, the second two digits are called the group number, and the last four digits are called the serial number. (*Id.*, Attachment A). The area numbers are, as the name suggests, assigned based on geographical location. Not all the three-digit area-number combinations have been assigned. The SAA publishes on its website a list of all the area numbers that have been assigned. Numbers 433 to 439 are assigned to Louisiana and numbers 449 to 467 are assigned to Texas. (Docket Entry No. 59, Attacment. A). All the social security numbers Parks used had Texas or Louisiana area numbers except two: one with an Oklahoma area number (446) and one with a Michigan area number (372). Parks's own social security number has area number 446. According to the presentence investigation report, Parks previously served time in a Michigan federal detention center. (Docket Entry No. 32 at 16).

The next two digits, the group number, are not assigned consecutively within each area number. Instead, as the SAA explains on its website:

> For administrative reasons, group numbers issued first consist of the ODD numbers from 01 through 09 and then EVEN numbers from 10 through 98, within each area number allocated to a State. After all numbers in group 98 of a particular area have been issued, the EVEN Groups 02 through 08 are used, followed by ODD groups 11 through 99.

(Docket Entry No. 58, Attachment A). The last four digits, the serial numbers, are assigned consecutively from 0001 to 9999. (*Id.*).

The SAA publishes a list each month stating the highest group number issued within each area number. In October 2005, when Parks submitted the FEMA applications at issue, the highest group number for each area number he used were as follows:[4]

- For area number 452, a Texas number Parks used five times, the highest group number was 99, meaning that all the group numbers and all or nearly all the social security numbers in that area number had been used.

- For area number 451, a Texas number Parks used three times, the highest group number was 99.

- For area number 464, a Texas number Parks used twice, the highest group number was 99.

- For area number 461, a Texas number Parks used once, the highest group number was 99.

- For area number 449, a Texas number Parks used once, the highest group number was 99.

- For area number 436, a Louisiana number Parks used once, the highest group number was also 99.

- For area number 446, the Oklahoma number, the highest group number was 19.

- For area number 372, the Michigan number, the highest group number was 31.

---

[4] Social Security Administration, Highest Group Issued as of 10/03/05, *available at* http://www.socialsecurity.gov/employer/ssnvs/HGOct0305.txt

5

This detailed information about social security numbers was not part of the record when Parks pleaded guilty or was sentenced.

In *Flores-Figueroa v. United States*, --- U.S. ----. 129 S. Ct. 1886, 1888 (2009), the Supreme Court held that a defendant cannot be convicted of aggravated identity theft under 18 U.S.C. § 1028A unless the government proves that he knew he was using the identifying information of another actual person. According to Parks, when he "pleaded guilty, he was not advised that proof of such knowledge was required and the government established only that he unlawfully used a Social Security number belonging to another, not that he knew the means of identification belonged to an actual individual." (Docket Entry No. 51 at 4).

After *Flores-Figueroa* was decided, Parks moved for postconviction relief, arguing that the government had not alleged or proven that he knew the social security numbers he used belonged to other people. In its response, the government relies on the fact that the fifteen numbers Parks used were in fact assigned to others. The government acknowledges that it has no proof that Parks had access to any source or list of assigned social security numbers and no proof that Parks knew to whom any of the numbers were assigned. The government relies on a statistical argument: it is so unlikely that Parks could have randomly arrived at fifteen numbers that had in fact been assigned to other people that he must have known that the numbers did belong to others. (Docket Entry No. 58). Parks has filed a reply, arguing that the government's statistical argument is misleading because it does not account for the fact that so many of the social security numbers in the area numbers that Parks used were assigned, making it likely that a randomly chosen number would be assigned to an actual person. (Docket Entry No. 59). The government has responded. (Docket Entry No. 60).

These arguments are considered below.

## II.     The Legal Standard

28 U.S.C. § 2255 provides in relevant part that:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"Section 2255 provides the primary means of collateral attack on a federal sentence. Relief under this section is warranted for any error that occurred at or prior to sentencing." *Cox v. Warden, Federal Detention Center*, 911 F.2d 1111, 1113 (5th Cir. 1990) (internal quotations and citations omitted). A section 2255 motion requires an evidentiary hearing unless the motion, the files, and the record conclusively show the prisoner is entitled to no relief. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). A "collateral challenge may not do service for an appeal." *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (en banc) (*quoting United States v. Frady*, 456 U.S. 152, 165 (1982)). A movant generally is barred from raising claims for the first time on collateral review unless he demonstrates cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Bousley v. United States*, 523 U.S. 614, 622-23, 118 S. Ct. 1604 (1998); *Shaid*, 937 F.2d at 232 (citations omitted). If the error is not of constitutional or jurisdictional magnitude, the defendant must show that "the error could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice." *Id.* at 232 n.7.

An issue that was not presented on direct appeal can also be raised in a collateral attack if a defendant who has pleaded guilty "can establish that the constitutional error in his plea colloquy 'has probably resulted in the conviction of one who is actually innocent.'" *Bousley*, 523 U.S. at 623,

7

118 S. Ct. 1604 (quoting *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639 (1986)). "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (quotations omitted). Because "'actual innocence' means factual innocence, not mere legal insufficiency," the government may go beyond the existing record to rebut the defendant's arguments. *Id.* at 623-24; *see also United States v. Torres*, 163 F.3d 909, 912 (5th Cir. 1999). If the defendant can show actual innocence, the court may review the constitutionality of his conviction.

## III. Analysis

Parks argues that he is actually innocent of the aggravated identity theft charge under 18 U.S.C. § 1028A(a)(1) because no reasonable juror could find beyond a reasonable doubt that he knew the social security numbers he used were assigned to other people. This argument is based on the *Flores-Figueroa* holding that "§ 1028A(a)(1) requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." *Flores-Figueroa*, 129 S. Ct. at 1894. In that case the defendant, a citizen of Mexico, had provided his employer with counterfeit social security and alien registration cards, each of which bore his name and numbers that were assigned to other individuals. *Id.* at 1889. The government had not proven that the defendant knew that the social security and alien registration numbers were authentic. *Id.* Flores-Figueroa argued that this was a basis for acquittal on the aggravated identity theft charge because the statute criminalized "*knowingly* transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person." *See* 18 U.S.C. § 1028A(a)(1) (emphasis added). After a bench trial, the district court found the defendant guilty and the Eighth Circuit affirmed. *Flores-Figueroa*, 129 S. Ct. at 1889. The Supreme Court granted *certiorari* because a circuit split had developed on whether "knowingly" applied to the words "of another person" in the

8

statute. Based on the ordinary reading of the statute, prior interpretations of similar statutes, and the absence of any contrary legislative intent, the Court held that "knowingly" applied to all elements of the statute and reversed Flores-Figueroa's conviction. *Id.* at 1889-94.

The *Flores-Figueroa* Court addressed the government's argument that it would be difficult to prove beyond a reasonable doubt that any defendant knew identifying information belonged to an actual person. The Court noted that, "in the classic case of identity theft, intent is generally not difficult to prove." *Id.* at 1893. When, for example, a defendant obtains a person's identifying information by such deceptive means as impersonating a bank employee, digging through that individual's trash, or hacking into that individual's computer, it is clear that the defendant knew the information belonged to another person. To the extent that requiring such knowledge might complicate prosecuting cases like *Flores-Figueroa*, there was no indication in the statutory language or legislative history that Congress intended a different result. *Id.* at 1893-94.

Case law applying *Flores-FIgueroa* has begun to accumulate. Although no case confronts the precise issues presented here, there is some guidance on the proof necessary to show that the defendant knew the identifying information belonged to someone else. One court recently described such cases as involving "direct evidence" of knowledge or evidence sufficient to support an "inference of such knowledge." *United States v. Morgan*, No. 2:06-cr-0164, 2010 WL 1714705, at *10 (E.D. Pa. Apr. 27, 2010). The cases are consistent with this description.

In *United States v. Tureseo*, 566 F.3d 77 (2d Cir. 2009), the Second Circuit vacated, on direct appeal, the aggravated identity theft conviction of a defendant who had used another person's birth certificate to claim United States citizenship. Because the defendant had used the same person's name, date of birth, biographical information, and birth certificate, there was "substantial evidence" that the defendant knew the birth certificate belonged to a real person. *Id.* at 86. But because the

9

victim had testified at trial that he had never met or seen the defendant, the Second Circuit cold not conclude that the district court's failure to instruct the jury on the *Flores-Figueroa* standard was harmless beyond a reasonable doubt. *Id.*

In *United States v. Gaspar*, 344 F.App'x 541 (11th Cir. 2009) (per curiam) (unpublished), the court also vacated the defendant's aggravated identity theft conviction on direct appeal. The defendant, Gaspar had submitted a passport application using, among other fraudulent identifiers, a birth certificate that belonged to another person. Gaspar had earlier used the same birth certificate to obtain a Florida driver's license and Florida identification card. Gaspar moved for a judgment of acquittal, arguing that there was no proof that she knew the birth certificate belonged to an actual person. The district court denied the motion for two independent reasons. First, Eleventh Circuit precedent in effect at the time did not require the government to prove that Gaspar knew the birth certificate belonged to an actual person. Second, even if such knowledge was required, it could be inferred from the stipulated evidence because Gaspar had paid money for the birth certificate and used it to obtain other documents before applying for the passport. *Id.* at 542-43. The Eleventh Circuit reversed based on *Flores-Figueroa*, which issued after the district court's decision. The Eleventh Circuit noted the absence of evidence that Gaspar had met or spoken with the victim or that the coworker who sold Gaspar the birth certificate had told her it was of a real person. Nor was there circumstantial evidence from which the requisite knowledge could be inferred because Gaspar had not committed any of the usual types of identity theft described by the *Flores-Figueroa* Court. The appellate court rejected the district court's use of circumstantial evidence and inference to prove intent. It was insufficient to make the logical assumption that Gaspar would want a real person's identifying information to pass the passport agency's background check. Such an inference "is refuted by the factual scenario in *Flores-Figueroa*, where the defendant remained employed for six

10

year using a Social Security number and counterfeit alien registration card that did not belong to a real person." *Id.* at 546. But even if that were a correct inference, "at most it proves that Gaspar might have an incentive to buy an authentic birth certificate, not that she *knew* whether she actually purchased one." *Id.* (emphasis in original).

The Eleventh Circuit reached a similar result in *United States v. De La Rosa*, 346 F.App'x 468 (11th Cir. 2009) (per curiam) (unpublished). De La Rosa also submitted a passport application using another person's name and birth certificate. Before *Flores-Figueroa* was decided, the district court found De La Rosa guilty after a bench trial. There was no evidence that De La Rosa knew the birth certificate belonged to an actual person. The Eleventh Circuit reversed because there was not "any evidence regarding how De La Rosa obtained the copy or whether he knew that it was real and not a forgery." *Id.* at 470. Citing *Flores-Figueroa*, the court noted that knowledge could not be proven beyond a reasonable doubt by showing that De La Rosa "sought to obtain a benefit" by using the other person's identity. *Id.* at 471 n.2.

In *United States v. Chandler*, No. 09-50132, 2010 WL 653718 (5th Cir. Feb. 24, 2010) (unpublished), the Fifth Circuit affirmed the aggravated identity theft conviction of a defendant who had used another person's name and social security number to open a bank account. The defendant, Brandon Chandler, opened the account using the name Brandy Chandler, a social security number assigned to a person named Brandy Chandler, and Brandon Chandler's own address and date of birth. *Id.* at *1. The defendant also wrote two "convenience checks" from the account. A convenience check allowed bank customers to spend money even when they had no money in their checking accounts. Chandler wrote these checks to himself from the Brandy Chandler account he had opened and signed them as Brandy Chandler. Based on this evidence, the jury convicted Chandler of aggravated identity theft. *Id.* at *1-2. It appears that the jury was properly instructed on the *Flores-*

11

*Figueroa* standard because, on appeal, Chandler argued only that the evidence was insufficient to prove that he knew Brandy Chandler was an actual person.

The Fifth Circuit stated that it would uphold the verdict if, drawing all reasonable inferences in support of the verdict, a reasonable trier of fact could conclude that each element of the offense had been proven beyond a reasonable doubt. *Id.* The court held that this standard was satisfied, rejecting Chandler's argument that he had "only tweaked his own social security number and had no way of knowing that the resulting number would belong to someone else." *Id.* Although two of the last four digits in both social security numbers were the same, Chandler's argument was "implausible" because Brandy's full social security number was not similar to Chandler's. "Use of her entire number in conjunction with her similar name supports an inference that Chandler knew the number belonged to someone else." *Id.* at *3. The court also observed that Chandler's signing the convenience checks after being warned by the bank that the social security number on the account was not his own "provides considerable support for the inference that he knew he was accessing funds using Brandy's identity." *Id.* Based on all the evidence, "a reasonable juror could have concluded beyond a reasonable doubt that he knew the number he provided belonged to another person." *Id.*

In *United States v. Stephens*, 571 F.3d 401, 406-07 (5th Cir. 2009), the Fifth Circuit also upheld the aggravated identity theft convictions of two brothers who had set up fake charity websites and lured people into making online credit card donations. The brothers tracked the names and identifying information of their donors and used some of this information to create PayPal accounts, without permission, in the donors' names. One of the brothers sent an e-mail to the other brother listing the accounts he had created along with the names, addresses, and social security numbers he had used to do so. Next to some of the social security numbers, he wrote "fake social." *Id.* The

Fifth Circuit held that this was sufficient to support the conviction because the jury could infer that the brothers knew that the social security numbers not marked as "fake" were real. *Id.*

*Stephens* was a relatively easy case in part because it matched one of the "classic" identity theft scenarios described in *Flores-Figueroa*. In addition to labeling the social security numbers they knew to be false—and by implication those they knew to be assigned—the evidence also showed that the brothers knowingly tricked actual people into providing the numbers. In the present case, by contrast, there is no similar evidence showing that Parks knew he was using actual social security numbers belonging to other people. This is not a "classic case" of identity theft. Nor is this case similar to *Chandler*, in which the evidence included the use of another person's similar name and that person's social security number, This case is more similar to the cases decided before *Flores-Figueroa* and reversed on appeal after that opinion issued, in which the evidence was held insufficient to support knowledge that the social security numbers used belonged to other people.

In the present case, the government makes a statistical argument that "[a]n analysis of the SSNs the defendant actually used, as well as simple mathematics, prove that the defendant knew the SSNs he used were assigned and certainly rebuts any notion that the defendant can met the heavy burden of proving it more likely than not that no reasonable juror could find that he knew the SSNs belonged to someone else." (Docket Entry No. 58 at 8). The government's argument proceeds as follows. First, the government notes that the social security numbers Parks used were not simply variations of his own social security numbers. He did not, for example, alter one or two digits in his own number to create the new numbers. The government also notes that the numbers Parks used are not similar to each other and do not follow any pattern. The government then challenges as statistically improbable Parks's assertion that random selection accounts for the fifteen valid, assigned social security numbers. Interpreting generously the information that 420 million social

13

security numbers out of the possible 980 million have been assigned, the government assumes that there is a 50% chance that a person would randomly select a social security number that had been assigned.[5] The probability of hitting an actual number 15 times in a row is one-half to the fifteenth power or ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½ * ½, which equals .0003. Because, under this model, there is a 99.997% chance that Parks would not have used fifteen actual numbers if he were choosing at random, the government argues that "[t]he only conclusion to be drawn from this data is that the defendant knew he was using valid SSNs belonging to other individuals in his fraudulent disaster assistance applications." (Docket Entry No. 58 at 11).

Parks responds by challenging the government's assumptions, which presume that all nine-digit combinations are equally likely to be an assigned social security number. Parks argues that "[i]f a person starts with a three digit code that he knows to be authentic, he substantially increases his odds of choosing an actual SSN by using random numbers." (Docket Entry No. 59 at 4). Parks used 12 Texas area numbers, the state in which he lived, 1 Louisiana number, a bordering state also affected by the hurricanes, 1 Oklahoma number, the state in which Parks was born and his number was issued, and 1 Michigan number, a state with which Parks had previous contact.

Parks's argument has merit. Within most of these area numbers, the probability of hitting an actual social security number by picking at random was quite high. For all the Texas area numbers and the Louisiana number, the highest group number was 99. In these area numbers, when picking the last six digits at random, the probability of choosing a number that had been actually assigned was close to 100%. The highest group numbers for the Oklahoma and Michigan area numbers were 19

---

[5] The Ninth Circuit recently held that there is no need to distinguish between the identities of living persons and deceased persons in the *Flores-Figueroa* aggravated identity theft analysis. *United States v. Maciel-Acala*, 598 F.3d 1239 (9th Cir. 2010). There is no need to prove that Parks knew that he was using the social security number of a *living* person.

and 31, respectively. Because the odd numbers of 11 and greater are the last to be assigned, these area numbers are also close to capacity. There is approximately a 59% chance of hitting an actual social security number in the Oklahoma area number and approximately a 65% chance of hitting an actual social security number in the Michigan area number. Assuming that a person starts with this combination of 15 area numbers, his odds of hitting 15 actual social security numbers by choosing at random are approximately: $1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * 1 * .59 * .65 = .38$. Instead of a .003% chance that Parks was choosing at random, this model would give him a 38% chance. A reasonable juror could not find beyond a reasonable doubt that Parks knew he was using actual social security numbers when, by picking the area numbers he did, Parks would have had nearly even odds of choosing fifteen actual social security numbers.

The government replies by pointing to the absence of any evidence in the record that Parks had information about the distribution of social security numbers that would have allowed him to improve his odds of choosing an actual number. Parks's "hypothetical" scenario involving a person who understood the importance of picking an actual area number, the government argues, does not support his claim of actual innocence. (Docket Entry No. 60 at 2). The government attempts to support its argument by pointing to Parks's prior fraudulent use of social security numbers. According to the PSR, Parks has used seven "alias" social security numbers. (Docket Entry No. 32 at 3). Only four of the seven numbers were assigned to actual people. (Docket Entry No. 60, Attachment A). The government argues that this "failure rate" is inconsistent with Parks's argument that he could have chosen fifteen assigned numbers by selecting numbers within a area number at random.

The social security numbers Parks used in a prior fraudulent scheme do not support the government's argument. Parks used the following seven social security numbers: xxx-xx-2276; xxx-

15

xx-4076; xxx-xx-8888; xxx-xx-4078; xxx-xx-4076; xxx-xx-4076; xxx-xx-4394. All use actual area numbers. Four of the seven social security numbers use the same Oklahoma area number, 446, that begins Parks's true social security number. One of the 446 numbers Parks used was not assigned. Based on the October 2005 table of highest group numbers issued, there was a 59% chance of hitting an assigned social security number when picking six random numbers after 446. Of the four social security numbers Parks used that began with 446, three were assigned. Given the small sample size, this is entirely consistent with the probability. Parks used one social security number beginning with the area number 445, which is also an actual Oklahoma area number. In October 2005, the highest group number in this area number was 19, the same as for area number 446. The social security number Parks used beginning with 445 was one of the three that was not assigned. Choosing an unassigned social security number is consistent with a 41% chance of doing so. Parks also used one social security number beginning with 507, an area number assigned to Nebraska. This social security number was actually assigned. In October 2005, the highest group number assigned in the area number was 49, meaning that the probability of randomly choosing an assigned number is approximately 74%. The final social security number Parks used was unassigned. It began with 394, an area number assigned to Wisconsin. The highest group number assigned in that area number in October 2005 was 25, meaning that the probability of randomly choosing an actual number was 62%. The alias social security numbers Parks previously used do not undermine Parks's argument that he did not knowingly select assigned social security numbers for his fraudulent FEMA applications.

The government also argues that any knowledge of how social security numbers are distributed does not support—and should actually work against—Parks's claim of actual innocence. The argument is that "a jury presented with evidence that the defendant drew upon his alleged exposure to assigned SSNs – as well as his prior criminal activity – to maintain a mental record of

16

numbers likely to produce valid SSNs would be even more likely to reach the conclusion that the defendant knew [or was willfully blind to the fact that] he was using SSNs belonging to others in his disaster assistance applications." (Docket Entry No. 60 at 2). But unlike in *Chandler*, No. 09-50132, 2010 WL 653718, at *2-3, the government's argument does not make Parks's explanation so implausible that a reasonable juror could find him guilty beyond a reasonable doubt. In *Chandler*, the defendant, Brandon Chandler, opened an account using a name, Brandy Chandler, that was nearly the same as his own. And the social security number he used was assigned to Brandy Chandler. Chandler's motivation for choosing that name was revealed at trial by his father's testimony that Chandler had gone by the nickname "Brandy." Chandler's argument that he had invented a fake social security number that just happened to match up with an actual number assigned to a person with a name so similar that it was Chandler's nickname was "vapid." *Id.* at *3.

The circumstances surrounding Parks's use of social security numbers are not so transparent. There is no evidence that Parks knew or used the name of any of the individuals whose social security numbers he used on the disaster assistance applications. The mere fact that Parks knew some actual area numbers used by the SSA does not mean that he *knew* that the numbers he created were the social security numbers assigned to actual people. At best, Parks used his knowledge of the social security system to improve his chances of randomly choosing an assigned number. In choosing the numbers he used on the FEMA applications and his "alias" social security numbers, Parks used actual area numbers. The evidence suggests that Parks knew something about social security numbers, enough to choose actual area numbers, but not enough to prove, beyond a reasonable doubt, that Parks knew the numbers he used were assigned to real people.

The government argues that Parks willfully blinded himself to whether he was using actual social security numbers and that such willful blindness "would most certainly result in a conviction

17

for aggravated identity theft." (Docket Entry No. 60 at 2). In some circumstances, willful blindness or deliberate ignorance can substitute for proof of knowledge. *United States v. Peterson*, 244 F.3d 385, 395 (5th Cir. 2001). The Fifth Circuit has directed district courts to instruct juries on willful blindness when "the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999), *cert. denied*, 528 U.S. 871, 120 S. Ct. 172 (1999). Such instructions should be given rarely. *Id*. When the instruction is appropriate, the pattern instructions suggest the following: "You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." Fifth Circuit Pattern Crim. Jury Instr. 1.37 (2001).

In this case, a willful blindness instruction would likely have been inappropriate. Even if Parks was subjectively aware of a probability that he was choosing assigned social security numbers, there is no evidence of "purposeful contrivance" to avoid knowledge that he was doing so. And a reasonable juror could not find beyond a reasonable doubt that Parks "deliberately closed his eyes to what would otherwise have been obvious to him." There has been no showing that Parks avoided learning facts that would have informed him that he was using assigned social security numbers or that he ignored information that was presented to him.

By contrast, in *Peterson*, 244 F.3d at 389-95, the Fifth Circuit affirmed a jury's guilty verdict based on the willful blindness of telemarketers to (or their actual knowledge of) the fact that they were collecting money for services that their employer never provided. The defendants solicited

landowners attempting to sell their properties to pay fees in exchange for finding buyers for the properties. Very few of the properties were ever sold. Because the defendants received a bonus for each property sold, they knew the properties were not selling. They also received numerous reports from the company that the business was successfully earning money. The Fifth Circuit found that there was sufficient evidence on which the jury could conclude that the defendants knew their company was a "fraudulent scheme" or "were aware of a high probability that [the company's] operations constituted fraud but chose not to investigate." *Id.* at 391, 395. No similar circumstantial evidence exists here that would establish knowledge or willful blindness beyond a reasonable doubt. Parks is "actually innocent" of aggravated identity theft.

Because Parks is "actually innocent," it is appropriate to reach the merits of his collateral challenge. Refusing to vacate a conviction for conduct that the Supreme Court has since deemed noncriminal "would offend the Due Process Clause of the Fifth Amendment." *United States v. Gobert*, 139 F.3d 436, 439 (5th Cir. 1998). Due process requires that Parks's conviction for aggravated identity theft be vacated under *Flores-Figueroa.* Due process also requires that his conviction be vacated because his guilty plea was not knowing and voluntary. *DeVille v. Whitley*, 21 F.3d 654, 657 (5th Cir. 1994). A guilty plea is constitutionally valid only if the defendant understood the nature of the charges against him. *Henderson v. Morgan*, 426 U.S. 637, 644-65 & n. 13 (1976). If neither the defendant, his counsel, nor the court "correctly understood the essential elements of the crime with which he was charged," the guilty plea would be "constitutionally invalid." *Bousley*, 523 U.S. at 618-19, 118 S. Ct. 1604. Because *Flores-Figueroa* had not been decided when Parks pleaded guilty, one of the essential elements of aggravated identity theft was not properly understood.

**IV.     Conclusion**

Parks's § 2255 motion is granted. The government's motion to deny relief is denied. Parks's conviction and sentence for aggravated identity theft under 18 U.S.C. § 1028A are vacated. The parties must confer and file a proposed form of order and final judgment by May 28, 2010.

SIGNED on May 17, 2010, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge